# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SUZANNE CAROL BLANTON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00024 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: Pamela Meade Sargent |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

## I. Background and Standard of Review

Plaintiff, Suzanne Carol Blanton, ("Blanton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blanton protectively filed her application for DIB on April 25, 2017, alleging disability as of November 22, 2016, based on post-traumatic stress disorder, ("PTSD"); anxiety; borderline personality disorder; and depression. (Record, ("R."), at 15, 182-83, 221, 261.) The claim was denied initially and upon reconsideration. (R. at 97-99, 101-03, 107-09, 112-19.) Blanton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 120-21.) The ALJ held a hearing on October 25, 2019, at which Blanton was represented by counsel. (R. at 36-60.)

By decision dated November 19, 2019, the ALJ denied Blanton's claim. (R. at 15-29.) The ALJ found Blanton met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2018. (R. at 17.) The ALJ found Blanton had not engaged in substantial gainful activity since November 22, 2016,[2] the alleged onset date. (R. at 17.) The ALJ determined that, through the date last insured, Blanton had severe impairments, namely alcohol and substance use disorder; borderline personality disorder; depression; anxiety; attention deficit hyperactive disorder, ("ADHD"); and PTSD, but he found Blanton did not have an impairment or combination of impairments that met or medically equaled one of the

---

[2] Therefore, Blanton must show she was disabled between November 22, 2016, the alleged onset date, and September 30, 2018, the date last insured, to be eligible for benefits.

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that, through the date last insured, Blanton had the residual functional capacity to perform a full range of work at all exertional levels that did not require exposure to hazards or unprotected heights; that did not require more than occasional decision making and changes in the work setting; that did not require production rate or pace work; that did not require public interaction; and that required no more than occasional interaction with co-workers and supervisors. (R. at 20.) The ALJ found that, through the date last insured, Blanton was unable to perform any of her past work. (R. at 28.) Based on Blanton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Blanton could perform, including the jobs of a linen room attendant, a laundry worker and a marker. (R. at 28-29.) Thus, the ALJ concluded Blanton was not under a disability as defined by the Act from April 25, 2017, through September 30, 2018, the date last insured, and she was not eligible for DIB benefits. (R. at 29.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Blanton pursued her administrative appeals, (R. at 177-78), but the Appeals Council denied her request for review. (R. at 1-5.) Blanton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Blanton's motion for summary judgment filed March 12, 2021, and the Commissioner's motion for summary judgment filed April 12, 2021.

## II. Facts [3]

Blanton was born in 1985, (R. at 182), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Blanton has an associate degree in nursing and past work experience as a registered nurse. (R. at 43, 222.) Blanton stated she experienced crying spells and panic attacks every couple of weeks. (R. at 48, 53.) She stated she experienced flashbacks of her traumatic childhood and had nightmares for which she was prescribed medication. (R. at 49.) She testified she had not consumed alcohol in "well over" a year. (R. at 44.) Blanton cared for her children and husband and described herself as a "full-time caregiver at home when I feel good." (R. at 44.) She stated she helped her children get ready for school, drove them to and from school and took them to practices and doctors' appointments. (R. at 44, 239.)

Rick Bradley, a vocational expert, also was present and testified at Blanton's hearing. (R. at 56-59.) Bradley was asked to consider a hypothetical individual of Blanton's age, education and work history, who could perform a limited range of light[4] and medium[5] work that did not require more than occasional decision making or changes in the work setting; that did not require strict production rate or pace requirements; that required only occasional interaction with co-workers and

---

[3] Blanton's arguments center around the ALJ's findings related to her mental residual functional capacity. Therefore, the court will limit its discussion to those facts relevant to Blanton's mental impairments and accompanying limitations.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2020).

supervisors and no interaction with the public; and that did not require her to work around hazards. (R. at 57.) He stated the hypothetical individual could not perform Blanton's past work, but a significant number of other jobs existed that such an individual could perform, including jobs as a linen room attendant, a laundry worker and a retail marker. (R. at 57-58.) Bradley stated there would be no jobs available should the hypothetical individual have limitations as found by Blanton's counselor, Lori Long, which included no ability to tolerate work stresses; to behave in an emotionally stable manner; to behave appropriately while at work; to maintain her emotions in the work environment; to interact appropriately with supervisors and co-workers; and to interact with others. (R. at 58.) He stated, there would be no work available should an individual have no ability to behave in an emotionally stable manner or to interact with others. (R. at 59.)

In rendering his decision, the ALJ reviewed records from Julie Jennings, Ph.D., a state agency psychologist, ("J. Jennings"); Stephen P. Saxby, Ph.D., a state agency psychologist; Woodridge Hospital; Bristol Regional Medical Center; Life Center of Galax, ("Life Center"); Southwestern Virginia Mental Health Institute; Laurels Crisis Stabilization Unit, ("Laurels"); Lori M. Long, L.P.C., a licensed professional counselor; Elizabeth Jennings, M.A., a licensed psychologist, ("E. Jennings"); Mountain View Regional Medical Center, ("Mountain View"); Carilion Clinic; Community Physicians Norwise OB/GYN; Wellmont Medical Associates; Frontier Health; and Mountain States Psychiatry.

Blanton received inpatient psychiatric care for mental disorders and substance abuse problems approximately five times during the relevant time period. On November 22, 2016, Blanton was admitted to Woodridge Hospital on an emergency commitment basis for complaints of severe depressive symptoms. (R. at 286-300.)

At that time, she reported a recent separation from her husband and consumption of alcohol three to four times a week. (R. at 287.) Her condition stabilized with medications and detoxification protocol, and she was discharged on November 27, 2016, with a diagnosis of major depression, recurrent, severe; rule out bipolar disorder, most recent episode depressed, severe; depressive disorder due to general medical condition; and sleep disorder, insomnia. (R. at 296.) On December 13, 2016, Blanton presented to Bristol Regional Medical Center following a suicide attempt by overdose. (R. at 301-19.) Blanton stated she consumed five shots of liquor and ingested an unknown quantity of Ambien. (R. at 303.) She stated she had not attempted suicide prior to this attempt.[6] (R. at 303.) A CT scan of Blanton's head was normal. (R. at 308.) She was diagnosed with bipolar 1 disorder, mixed state, severe without psychotic features; rule out major depressive disorder, recurrent, severe without psychotic features; and alcohol use disorder. (R. at 312.) Blanton received inpatient psychiatric treatment from December 13 to December 21, 2016, when she was transferred to the Life Center for detoxification. (R. at 321-419.)

Upon her admission to the Life Center, Blanton reported she first consumed alcohol at the age of 25 and consumed one-fifth of vodka daily. (R. at 322, 334.) On December 28, 2016, Blanton underwent a psychiatric evaluation and reported a history of panic attacks. (R. at 379-82.) Examination revealed Blanton had no hallucinations, delusions, suicidal or homicidal thoughts; her judgment, insight, recent and remote memory, attention span and concentration and language were intact; and she had an anxious mood and appropriate affect. (R. at 381-82.) That same day, Blanton participated in group therapy and reported she was mentally and

---

[6] Blanton's husband reported Blanton also had contemplated suicide the week prior with a loaded gun and had attempted suicide two months prior. (R. at 303.) For the most recent suicide attempt, he reported Blanton drove with their three-year-old in the vehicle after ingesting alcohol and Ambien. (R. at 303.)

emotionally happy. (R. at 385.) Upon discharge, on January 11, 2017, Blanton was diagnosed with severe alcohol use disorder and unspecified depressive disorder. (R. at 334.)

Blanton was treated at Mountain States Psychiatry from December 2016 through July 2019 for major depressive disorder; generalized anxiety disorder; panic attacks; PTSD; bipolar disorder, not otherwise specified; alcohol dependence; ADHD; and borderline personality disorder. (R. at 856-57, 954-67.) In December 2016, Blanton reported she self-medicated with alcohol when she felt overwhelmed. (R. at 965.) In February 2017, Blanton reported she discontinued Trazodone because it was ineffective, and she began consuming alcohol again due to becoming "overwhelmed." (R. at 964.) She described her depression as none to mild and her anxiety as mild to moderate. (R. at 964.) It was reported Blanton was well-groomed and cooperative; she had an anxious mood and congruent affect; her speech was normal; her judgment and insight were deemed fair to good; her memory was good; and her thought process was coherent with some intrusive thoughts. (R. at 964, 966.)

On February 5, 2017, Blanton was admitted to the Southwestern Virginia Mental Health Institute on a temporary detention order following an argument with her husband that led to concerns of a possible suicide attempt. (R. at 420-559, 858-61.) Upon admission, Blanton denied any intent of self-harm, but admitted she purchased alcohol after she left her home following the argument with her husband. (R. at 423.) Blanton was diagnosed with bipolar II disorder; alcohol use disorder, severe; and unspecified personality disorder. (R. at 424.) Her condition stabilized with medications, and she was transferred to the Laurels on February 7, 2017, where she received additional treatment. (R. at 424, 426, 543, 560-784.) While at the Laurels, Blanton's mental examinations revealed her mood was anxious, depressed

and labile; her affect was flat and constricted; she displayed no formal thought disorder; her memory was within normal limits; her insight and judgment were deemed normal to fair; she had normal impulse control; her attention and concentration were normal; and her cognition was grossly intact. (R. at 576, 590.) Blanton denied any history of abuse or trauma. (R. at 588.) Blanton was discharged on February 24, 2017, with a diagnosis of major depressive disorder, single episode, severe; generalized anxiety disorder; and alcohol dependence, in remission. (R. at 677.) Blanton's prognosis was deemed good with continued outpatient care. (R. at 674.)

On March 17, 2017, Blanton sought mental health treatment at Frontier Health. (R. at 785-98.) She was diagnosed with bipolar II disorder and alcohol use disorder, severe. (R. at 798.) On March 23, 2017, Blanton's mood was stable, and she was mildly anxious with a congruent and appropriate affect. (R. at 830.) She reported she was not taking any medications and denied alcohol use. (R. at 830.) On April 5, 2017, after notifying the staff at Frontier Health that she did not believe the agency would be a "good fit for her," Blanton was discharged.[7] (R. at 808.)

On March 28, 2017, Lori M. Long, L.P.C., a licensed professional counselor, evaluated Blanton.[8] (R. at 995-97.) Blanton reported sexual abuse and trauma as a child, and she consumed alcohol to "ease her pain." (R. at 995-96.) Long reported

---

[7] Blanton underwent screening, intake and one therapy session at Frontier Health before being discharged. (R. at 808.)

[8] On May 15, 2017, and March 1, 2018, Long indicated she treated Blanton weekly for outpatient therapy beginning March 28, 2016. (R. at 839, 879.) She diagnosed Blanton with borderline personality disorder and recommended weekly individual therapy sessions and marriage counseling. (R. at 839, 879.)

Blanton was cooperative; she was restless and exhibited occasional sad facial grimaces of anxiety and dysphoria; her thought content was rational and coherent; her affect was full; she had poor insight and self-awareness; and her short-term memory and concentration were slightly impaired. (R. at 996.) Long diagnosed borderline personality disorder and PTSD. (R. at 997.) Long opined Blanton would be unable to continue gainful employment. (R. at 997.)

On March 31, 2017, Blanton was seen at Mountain States Psychiatry stating she discontinued her medications. (R. at 963.) She stated she was still anxious but felt better off the medications. (R. at 963.) She described her depression as mild to moderate and her anxiety as moderate to severe. (R. at 963.) On May 22, 2017, Blanton reported her anxiety had improved, and she described her depression as mild and her anxiety as mild to moderate. (R. at 962.) At these visits, Blanton was well-groomed and cooperative; she had an anxious or euthymic mood and congruent affect; her speech was normal; her judgment and insight were fair; and her thought process was coherent. (R. at 962-63.)

On June 9, 2017, Blanton was seen at Wellmont Medical Associates for "medication concerns." (R. at 843-48.) She reported she consumed alcohol in the past week after being sober for six months. (R. at 843.) Blanton reported anxiety aggravated by family issues and social activities. (R. at 843.) Dr. James W. Campbell, D.O., reported that, although Blanton appeared anxious, her mood, affect and behavior were normal. (R. at 845-46.) Dr. Campbell diagnosed generalized anxiety disorder and alcohol abuse, in remission. (R. at 846-47.)

On October 12, 2017, Elizabeth Jennings, M.A., a licensed psychologist, evaluated Blanton at the request of Disability Determination Services.[9] (R. at 849-53.) Blanton reported being severely abused as a child, including being sexually molested, and being involved in a violent domestic relationship while in high school. (R. at 850.) E. Jennings reported Blanton was tearful and appeared anxious; her affect was commensurate with anxiety and depression; she was cooperative; she had mild difficulty following questions, which appeared to be due to anxiety; her speech was labored and somewhat rambling and manic, but was coherent with normal cadence and tone; her stream of thought suggested tangentiality; her thought content was void of delusions, preoccupations, obsessions or phobias; she displayed no evidence of perceptual abnormalities; her judgment was markedly deficient; her immediate and recent memory were within normal limits; her remote recall was moderately deficient; and her concentration was within normal limits. (R. at 851-52.) E. Jennings diagnosed PTSD; panic disorder; unspecified personality disorder with borderline traits; unspecified bipolar disorder, provisional; and alcohol use disorder, in early full remission. (R. at 853.) She reported Blanton's prognosis was guarded. (R. at 853.) E. Jennings opined Blanton was unable to complete complex instructions and was unable to perform gainful employment. (R. at 853.)

On November 6, 2017, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Blanton suffered from a severe trauma and stressor-related disorder, an anxiety and obsessive-compulsive disorder and a personality disorder. (R. at 66-67.) She opined Blanton's substance addiction disorder was not severe. (R. at 66.) J. Jennings opined Blanton had mild limitations on her ability to understand, remember and apply

---

[9] The court notes that licensed psychologist Melinda M. Fields's name is affixed to this report in addition to E. Jennings. (R. at 853-54.)

information and to adapt and manage herself and moderate limitations on her ability to interact with others and to concentrate, persist or maintain pace. (R. at 66.)

That same day, J. Jennings also completed a mental assessment, indicating Blanton had moderate limitations[10] in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 68-70.) J. Jennings stated Blanton's work-related mental abilities were, otherwise, not significantly limited. (R. at 69-70.) J. Jennings stated that Blanton would be limited to simple, unskilled, nonstressful work with some social limitations. (R. at 70.)

On December 11, 2017, Blanton was seen at Mountain States Psychiatry, reporting difficulty sleeping and that her moods were "out of control." (R. at 856.) She described her anxiety and depression as mild. (R. at 856.) Blanton reported she discontinued Neurontin because it did not help and also had discontinued Antabuse.

---

[10] The regulations define a moderate limitation as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020.)

(R. at 856.) However, by March 2018, Blanton reported her medication helped her symptoms. (R. at 857.) Blanton was well-groomed and cooperative; she had a good mood and full affect; her judgment and insight were fair; her thought process was coherent; and she denied suicidal ideations. (R. at 857.) Blanton described her depression and anxiety as mild. (R. at 857.)

On March 7, 2018, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a PRTF, indicating Blanton suffered from a severe trauma and stressor-related disorder, an anxiety and obsessive-compulsive disorder and a personality disorder. (R. at 82-83.) He opined Blanton's substance addiction disorder was not severe. (R. at 82.) Saxby opined Blanton had mild limitations on her ability to understand, remember and apply information and to adapt and manage herself and moderate limitations on her ability to interact with others and to concentrate, persist or maintain pace. (R. at 83.)

That same day, Saxby also completed a mental assessment, indicating Blanton had moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond

appropriately to changes in the work setting. (R. at 85-87.) Saxby stated Blanton's work-related mental abilities were, otherwise, not significantly limited. (R. at 85-87.) Saxby also stated that Blanton would be limited to simple, unskilled, nonstressful work with some social limitations. (R. at 87.)

On March 27, 2018, Long performed a follow-up evaluation. (R. at 998-1000.) Blanton reported strained and unstable relationships with family and friends and that her marriage continued to be in crisis. (R. at 999.) Blanton was more withdrawn and isolated. (R. at 999.) Blanton complained of a "panic episode" where she felt "totally out of control." (R. at 999.) Long noted these symptoms were consistent with borderline personality disorder, PTSD and panic disorder. (R. at 999.) Long added panic disorder to her diagnoses. (R. at 1000.)

On April 6, 2018, Blanton was brought to the emergency department at Mountain View on a paperless emergency custody order, ("ECO"), following suicidal threats. (R. at 861-68.) She was charged with a driving under the influence, ("DUI"), after being pulled over for erratic driving. (R. at 867.) Blanton stated she took Seroquel with three shots of Vodka after becoming upset while attempting to complete her disability paperwork, which brought back memories of past child sexual abuse. (R. at 861, 874.) Blanton was medically stabilized and admitted to the Psychiatric Rehab Hospital at Carilion Clinic. (R. at 864, 867-78.) Her suicidal thoughts resolved quickly, and she did well with medication treatment. (R. at 874-75.) Blanton was discharged on April 12, 2018, with diagnoses of acute adjustment disorder with mixed disturbance of emotions and conduct; chronic PTSD; bipolar II disorder, major depressive episode; and bipolar II disorder. (R. at 873-74.)

On June 4, 2018, Blanton was seen at Mountain States Psychiatry, reporting her increased Seroquel dosage helped her symptoms. (R. at 959.) However, she reported she got together with her family, got "very drunk" and planned to drive herself off a cliff. (R. at 959.) Blanton was well-groomed and cooperative; she had a euthymic mood and congruent affect; her speech was normal; her judgment and insight were fair; and her thought process was coherent. (R. at 959.) Blanton described her depression and anxiety as moderate. (R. at 959.) Blanton was diagnosed with ADHD in addition to her previous diagnoses. (R. at 959.)

On June 5, 2018, Long completed a Mental Residual Functional Capacity Questionnaire, indicating she had treated Blanton weekly to bi-weekly since March 28, 2017, for PTSD; borderline personality disorder; occupational problems; family discord; and court and legal issues. (R. at 944-48.) Long reported Blanton's therapy response was slow due to her difficulty following through with intervention strategies. (R. at 944.) She reported Blanton had normal appearance and speech; she had an inconsistent mood; she demonstrated high risk behavior; she had poor insight and judgment; and she had unstable interpersonal relationships. (R. at 944.) Long opined Blanton had a limited, but satisfactory, ability to remember work-like procedures; to make simple work-related decisions; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to respond appropriately to changes in a routine work setting; and to be aware of normal hazards and take appropriate precautions. (R. at 946.) She found Blanton had a seriously limited, but not precluded, ability to understand, remember and carry out detailed instructions. (R. at 947.)

Long found Blanton had an unsatisfactory ability to maintain attention for two-hour segments; to work in coordination with or proximity to others without

being unduly distracted; to deal with normal work stress; and to set realistic goals or make plans independently of others. (R. at 946-47.) She opined Blanton had no useful ability to maintain regular attendance and be punctual within customary, usually strict tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to deal with stress of semi-skilled and skilled work; to interact appropriately with the general public; and to maintain socially appropriate behavior. (R. at 946-47.) Long found Blanton would be absent from work more than four days a month. (R. at 948.)

On October 22, 2018, Blanton was seen at Mountain States Psychiatry, reporting increased stress due to an upcoming court date related to a DUI charge. (R. at 958.) She reported two to three panic attacks a week and occasional irritability. (R. at 958.) Blanton was well-groomed and cooperative; she had a euthymic mood and congruent affect; her speech was normal; her judgment and insight were fair; her thought process was coherent; and she denied suicidal ideations. (R. at 958.) Blanton described her depression as mild and her anxiety as moderate. (R. at 958.)

On February 11, 2019, Blanton was seen at Mountain States Psychiatry, reporting Ativan helped her symptoms of anxiety "some." (R. at 957.) She reported she experienced irritability; yet she described her mood as "great." (R. at 957.) Blanton was well-groomed and cooperative; she had a euthymic mood and congruent affect; her speech was normal; her judgment and insight were fair; her thought process was coherent; and she denied suicidal ideations. (R. at 957.) Blanton described her depression and anxiety as mild. (R. at 957.)

On March 21, 2019, Long saw Blanton for a follow-up evaluation. (R. at 1002-06.) Blanton continued to struggle with instability and consistency. (R. at 1003.) Her marriage continued to be in crisis, her behavior continued to be inappropriate and erratic, and she continued to exhibit high-risk behavior. (R. at 1004.) Long reported Blanton presented well, but her mental health was unstable as evidenced by continuous inpatient hospitalizations. (R. at 1004.) Long opined Blanton had no tolerance for work stress, and her symptoms continued to be severe and pervasive. (R. at 1005.) Long noted Blanton showed no consistency in maintaining appropriate behavior, and she was labile with intense and erratic emotions. (R. at 1005.)

On March 26, 2019, Blanton was seen at Mountain States Psychiatry, reporting increased mood swings, crying spells and irritability. (R. at 955.) Blanton had a euthymic mood and congruent affect; her judgment and insight were fair; and her thought process was coherent. (R. at 955.) Blanton described her depression and anxiety as mild. (R. at 955.)  On July 31, 2019, Blanton reported she was having "ups and downs" around her menstrual cycle; yet she reported her mood was more stable. (R. at 954.) Blanton described her depression and anxiety as mild to moderate. (R. at 954.)

On August 15, 2019, Blanton was seen at Community Physicians Norwise OB/GYN for her annual exam. (R. at 984-85.) She reported worsening mood swings, insomnia and increased irritability prior to her menstrual cycle. (R. at 984.) Blanton also reported worsening of premenstrual symptoms to the point that she had an outburst and extreme agitation and worsening of anxiety and depression. (R. at 984.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Blanton argues the ALJ erred by improperly determining her residual functional capacity by failing to properly consider the opinions of Long, E. Jennings, Fields, J. Jennings and Saxby. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-22.) Blanton contends the ALJ improperly substituted his opinion regarding the severity of her mental impairments for those of a trained professional. (Plaintiff's Brief at 14.) Blanton also argues the ALJ failed to properly evaluate her subjective allegations. (Plaintiff's Brief at 22-25.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[11]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[12] In

---

[11] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

[12] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

-20-

The ALJ found that, through the date last insured, Blanton had the residual functional capacity to perform a full range of work at all exertional levels that did not require exposure to hazards or unprotected heights; that did not require more than occasional decision making and changes in the work setting; that did not require production rate or pace work; that did not require public interaction; and that required no more than occasional interaction with co-workers and supervisors. (R. at 20.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a).

In making his residual functional capacity finding, the ALJ stated he found the opinions of E. Jennings, Long and the state agency psychologists "not persuasive" and "inconsistent." (R. at 24-26.) The ALJ found E. Jennings's opinion that Blanton could not complete complex instructions was not supported by her own examination findings, which showed Blanton had normal orientation, memory[13] and concentration. (R. at 24, 852.) The ALJ also found E. Jennings's opinion was not consistent with the overall medical record, which failed to reflect significant problems following instructions or with cognition. (R. at 24-25.) E. Jennings noted Blanton had mild difficulty following questions, which appeared to be related to anxiety. (R. at 851.) While Blanton reported anxiety aggravated by family issues and social activities, she reported her medication helped her symptoms, and she described her anxiety as mild to moderate. (R. at 843, 856-57, 954-55, 957-59, 962.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). It was routinely reported that Blanton's memory was within normal limits; her insight and judgment

---

[13] As noted by the ALJ, E. Jennings found Blanton's remote recall to be moderately deficient because she had difficulty with details of her personal and employment history. (R. at 852.)

were fair to normal; her attention and concentration were normal; her thought content was rational and coherent; and her cognition was grossly intact. (R. at 576, 578, 580, 582, 590, 857, 955, 957-59, 962-66.) The ALJ did not evaluate E. Jennings's finding that Blanton was unable to perform gainful employment, as such findings are reserved for the Commissioner. (R. at 25, 853.) *See* 20 C.F.R. § 404.1520b(c) (2020) (explaining the ALJ is not required to analyze issues reserved to the Commissioner, such as whether a claimant is disabled, because they are "inherently neither valuable nor persuasive").

Second, the ALJ addressed the multiple opinions offered by Long, Blanton's treating therapist. (R. at 25, 944-48, 995-1000, 1002-06.) The ALJ explained Long's statements that Blanton was unable to work were not "medical opinions" under the regulations. (R. at 25, 1000, 1006.) *See* 20 C.F.R. § 404.1513(a)(2) (2020). He found Long's opinions that Blanton was unable to sustain an ordinary routine without special supervision, to maintain regular attendance, to accept instructions from supervisors and to get along with co-workers and peers as "not persuasive" because they were not supported by the "limited evidence" of Long's treatment or her explanation in the medical source statement. (R. at 25, 946-47.) The ALJ discussed the longitudinal record, which showed Blanton's brief inpatient hospitalizations were directly precipitated by her alcohol abuse. (R. at 25, 286-559, 861-78.) In addition, the ALJ found Long's opinions were "not consistent" with the overall medical evidence of record, which showed that, after February 2017, Blanton usually reported abstinence from alcohol or more controlled, less problematic drinking. (R. at 25.) He noted the only exception was Blanton's brief hospitalization after a DUI in 2018. (R. at 25.) As noted by the ALJ, Long based her opinions on Blanton's subjective complaints, as the record did not support thinking disturbances, illogical thinking and persistent disturbances of mood or affect. (R. at 25.)

As noted above, while Blanton reported anxiety aggravated by family issues and social activities, she reported her medication helped her symptoms, and she described her anxiety as mild to moderate. It was routinely reported that Blanton's memory was within normal limits; her insight and judgment were fair to normal; her attention and concentration were normal; her thought content was rational and coherent; and her cognition was grossly intact. In addition, Blanton reported being busy with social events, and she interacted normally with treating practitioners; thus, the ALJ found this was inconsistent with the opinion that Blanton could not interact with others or sustain an ordinary routine. (R. at 25.) The ALJ noted he accommodated Blanton's impairments related to stress and anxiety by limiting her to no production rate or pace work and only occasional decision making and changes in the work setting. (R. at 25.) Furthermore, as noted by the ALJ, Blanton's treating psychiatrist routinely documented unremarkable findings, including that Blanton had a normal mood and affect with no thinking disturbances or illogical thinking. (R. at 25, 856-57, 954-67.)

Third, the ALJ found the state agency psychologists' opinions were "not persuasive" because the limitations they expressed were vague and accompanied by qualifiers, e.g., "[Blanton] *may* need special supervision," her symptoms "would preclude *most* work with the general public," and "supervisors should exercise caution." (R. at 26, 68-70, 85-87.) He noted these vague limitations were "not consistent" with generally accepted vocational language and did not state the most Blanton could do. (R. at 26.) As noted by the ALJ, although the state agency psychologists found Blanton was limited to simple work, she had a recent work history as a registered nurse, which is classified as skilled work. (R. at 26.) The ALJ noted the state agency psychologists relied "heavily on [Blanton's] subjective symptom allegations" rather than the objective medical evidence, which showed

Blanton mostly required only routine and conservative treatment, except when she relapsed on alcohol. (R. at 25-26.) The ALJ also noted, since Blanton's alcohol abuse greatly improved after February 2017, she had not reported significant symptoms that would be expected to limit her to only simple work. (R. at 26.) Other than the one brief hospitalization when Blanton relapsed on alcohol in 2018, she received mostly routine and conservative treatment. (R. at 26.)

Blanton contends the ALJ improperly substituted his opinion regarding the severity of her mental impairments for those of a trained professional. (Plaintiff's Brief at 14.) I disagree. I find that the ALJ did not improperly substitute his opinion for that of trained mental health professionals. Instead, he considered the evidence related to Blanton's mental health impairments before arriving at his mental residual functional capacity finding. The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2020); *see also* 20 C.F.R. § 404.1527(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner).

As the ALJ discussed, the residual functional capacity finding was supported by the evidence showing Blanton's inpatient psychiatric admissions resulted primarily from her alcohol abuse; when her drinking remained under control, Blanton's treatment was routine and conservative, consisting of outpatient counseling and medication management. Moreover, Blanton experienced symptom improvement with medications; her treating psychiatrist routinely documented unremarkable mental status findings; and despite her conditions, Blanton cared for her family, drove, brought her children to practices and appointments, performed

household chores, cooked, shopped in stores and attended social functions. (R. at 44, 240-43, 852.) By discussing and relying on all the above evidence, the ALJ "buil[t] an accurate and logical bridge from the evidence to his conclusion[s]" about Blanton's residual functional capacity that permits meaningful judicial review. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

Lastly, Blanton argues the ALJ failed to properly evaluate her subjective allegations. (Plaintiff's Brief at 22-25.) The claimant's subjective allegations of pain or other symptoms alone can never establish disability. *See* 20 C.F.R. § 404.1529(a) (2020); *see also* Social Security Ruling, ("SSR"), 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). Rather, the ALJ must consider "the extent to which [statements about subjective] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the record. 20 C.F.R. § 404.1529(a). This Circuit has established a two-step process for determining whether a claimant is disabled by pain or other symptoms. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, a claimant must provide objective medical evidence showing that a medical impairment exists, which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. § 404.1529(b) (2020); *Craig*, 76 F.3d at 594. If the claimant meets this threshold obligation, the ALJ then considers the intensity and persistence of the claimant's pain or other symptoms and the extent to which it affects her ability to work. *See* 20 C.F.R. § 404.1529(c) (2020); *Craig*, 76 F.3d at 595.

The ALJ has the sole responsibility to weigh the claimant's complaints against the record as a whole, and he may discount them when they are unsupported. *See Craig*, 76 F.3d at 592-95. Here, the ALJ found Blanton's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. at 26). As the ALJ discussed, Blanton's statements of disabling mental symptoms were not supported by the overall longitudinal medical record, which showed Blanton had a few hospitalizations during the brief period from November 2016 through February 2017, but then her symptoms remained managed with routine and conservative treatment for over one year until another brief alcohol relapse in April 2018. (R. at 27.) The ALJ further explained the relatively unremarkable mental status findings documented throughout the record did not fully support Blanton's testimony. (R. at 27.) The ALJ reasonably relied on these inconsistencies between Blanton's alleged limitations and the objective medical evidence when weighing her subjective complaints. *See* 20 C.F.R. § 404.1529(c)(2) (stating that objective evidence is "a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work"); SSR 16-3p, 2016 WL 1119029, at *5 ("[I]nconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

The ALJ also explained Blanton's daily activities contradicted her testimony of disabling mental limitations. (R. at 27.) As the ALJ discussed, the record showed Blanton drove, cared for her children and husband and even described herself as a "full-time caregiver at home when I feel good." (R. at 44, 240.) She cared for her personal needs, prepared meals, shopped in stores and on-line, socialized with her family and performed household chores "on days [she felt] good." (R. at 240-43.) By her own admission, Blanton could follow written and spoken instructions "pretty

well," she got along "fine" with authority figures (although she was anxious around unfamiliar people and crowds), and she was never fired from a job because of problems getting along with others. (R. at 244-45.) She reported to her treating psychiatrist that she was busy attending ball games, graduations and graduation parties. (R. at 962.) Based on this, I find the ALJ appropriately relied on Blanton's daily activities when evaluating her subjective complaints. (R. at 27.) *See* 20 C.F.R. § 404.1529(c)(3) (ALJ may rely on daily activities when evaluating the claimant's symptoms); *Mastro v. Apfel,* 270 F.3d 171, 179-80 (4th Cir. 2001) (the ALJ properly considered claimant's activities in concluding that her impairment did not keep her from working); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life."); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (finding continued work activity and daily physical activities supported the ALJ's non-disability finding); *Gross*, 785 F.2d at 1166 (claimant's pattern of daily activities suggested non-disability).

Based on this, I find that substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that, through the date last insured, Blanton was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Blanton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    November 4, 2021.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE